952 F.2d 715
 1991-2 Trade Cases P 69,668
 TUNIS BROTHERS COMPANY, INC.; Richard N. De La Rigaudiere;
and David C. Smith,
v.
FORD MOTOR COMPANY; Ford Motor Credit Company; Wenner Ford
Tractor, Inc.; John S. Wenner; John Watson; Douglas N.
Crawford; Eugene W. Fraher; E.S. Hasel; Hugh Nickel;
Kenneth E. Harris; C.W. Wenzel
Ford Motor Company, Ford Motor Credit Company, and Wenner
Ford Tractor, Inc., Appellants in No. 90-1797.
TUNIS BROTHERS COMPANY, INC.; Richard N. De La Rigaudiere;
and David C. Smith, Appellants in No. 90-1816
v.
FORD MOTOR COMPANY; Ford Motor Credit Company; Wenner Ford
Tractor, Inc.; John S. Wenner; John Watson; Douglas N.
Crawford; Eugene W. Fraher; E.S. Hasel; Hugh Nickel;
Kenneth E. Harris; C.W. Wenzel.
 Nos. 90-1797, 90-1816.
 United States Court of Appeals,
Third Circuit.
 Argued June 27, 1991.
Decided Dec. 27, 1991.
As Amended Jan. 10, 1992.
Rehearing Denied Feb. 12, 1992.
 
 Arnold R. Ginsburg (argued), Haverford, Pa., for appellee, cross appellants.
 Robert C. Heim (argued), Jeffrey G. Weil, Robert A. Limbacher, and Geanne K. Zelkowitz, Dechert, Price & Rhoads, Philadelphia, Pa., for appellants Ford Motor Co. and cross appellee Ford Motor Credit Co.
 Steven T. Stern, Jokelson & Associates, Philadelphia, Pa., for appellant and cross appellee Wenner Ford Tractor, Inc.
 Before BECKER, MANSMANN and SCIRICA, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 In this appeal arising out of the termination of a franchised tractor dealership, we are presented with several issues stemming from the lengthy trial in which the plaintiff, Tunis Brothers Company, Inc., obtained a jury verdict for $227,605.50 in compensatory damages and $4 million in punitive damages against the defendants, Ford Motor Company, Ford Motor Credit Company and Wenner Ford Tractor, Inc.[1]
 
 
 2
 This lawsuit grew out of the sale of Tunis Brothers, a Ford tractor dealership and hardware business, from its original owner, Richard Tunis, to Richard de la Rigaudiere and David C. Smith, and Ford Motor Company's refusal to transfer the Ford franchise with that sale. At the root of its antitrust claim, Tunis Brothers claims that the three Ford defendants conspired to terminate its Ford tractor franchise in order to benefit a competitor Ford franchisee, defendant Wenner Ford. To evaluate the merits of the antitrust claim, we must visit the "mushroom capitol of the world" and the site of Tunis Brothers--Kennett Square, Pennsylvania--and learn of the preferences of Tunis Brothers' mushroom farming customers. Particularly, we need to assess whether the evidence demonstrates that the farmers' avowed preferences for Ford tractors and a Kennett Square Ford dealership satisfy the plaintiffs' burden of proof on the elements of relevant product and relevant geographic markets. Tunis Brothers' fraud claim, similarly, stems from alleged misrepresentations made by Ford Motor and Ford Credit to induce Tunis to resign as franchise holder prior to the consummation of the sale. Moreover, the propriety of seeking as damages lost gross profits, rather than lost net profits, will be addressed, as well as the level of outrageous conduct required to sustain an award of punitive damages.
 
 I.
 
 3
 Because the facts underlying this appeal are so important to its resolution and because the district court has so thoroughly described those facts in its post-verdict Memorandum and Order dated December 3, 1990, 1990 WL 198822, we shall adopt as our own a large portion of the statement of facts of that Memorandum. We will first provide background for this case, review its procedural history, and then, as we discuss in turn each legal issue, we will more fully set forth particularly relevant facts.
 
 
 4
 The following background consists of all undisputed facts and facts reasonably inferred from the jury's verdict, taken in the light most favorable to the plaintiffs, the verdict winners, as set forth in the district court's Memorandum Opinion:
 
 
 5
 Tunis Brothers Company, Inc. was founded by Richard N. Tunis and his brother Robert in 1934 as a tractor and farm supply business in Kennett Square, Pennsylvania, known colloquially as the "mushroom capital of the world." In 1959, Tunis Brothers became a Ford Motor Company franchised dealership selling Ford tractors, equipment and accessories, as well as non-Ford products. From May 1, 1974, until the resignation of Richard Tunis on March 17, 1981, the parties' relationship was governed by a "Dealer Sales and Services Agreement" (the "franchise agreement"). It is undisputed that this franchise agreement expressly required Ford's prior written consent to transfer of ownership of the Ford franchise and additionally permitted termination of the franchise at will on thirty (30) days written notice by Tunis Brothers or on sixty (60) days written notice by Ford.
 
 
 6
 Richard N. de la Rigaudiere was the nephew of Richard and Isabelle Tunis. He had worked at Tunis Brothers since 1966, eventually becoming the store's parts manager. David C. Smith was the owner of a local company named Fert-L Soil and a steady customer and friend of Richard Tunis. In March 1980, de la Rigaudiere and Smith approached Richard Tunis about the prospect of purchasing Tunis Brothers. The negotiations culminated in the sale of Tunis Brothers to de la Rigaudiere and Smith [on March 16, 1981] for the price of $450,000.00.
 
 
 7
 Wenner Ford is a Delaware corporation with its principal place of business in Concordville, Pennsylvania--about eleven miles east of Kennett Square. Wenner Ford was the authorized Ford dealer of farm and industrial tractors nearest to Tunis Brothers. It was established as a privately owned dealership by John Wenner, a former Parts Operations Manager for Ford in Michigan, in 1977. As a result of a serious cash-flow problem, John Wenner recapitalized Wenner Ford as a Ford Dealer Development dealership in July, 1979 with the assistance of Ford employees Eugene Fraher, John Watson and Hugh Nickel, and Ford Motor credit employee Howard W. Stoneback. Under the terms of this program, Ford purchased 79% of the equity of Wenner Ford and owned all of its voting stock. John Wenner retained 21% of the equity and operated Wenner Ford as its President and Chief Executive Officer. Wenner was to buy out Ford's interest incrementally and eventually return to private dealer status.
 
 
 8
 District Court Memorandum Opinion Typescript at 6 -8.
 
 
 9
 We will detail later the miscommunications characterizing the plaintiffs' negotiations with Ford, but a framework sketch is necessary here to provide a factual context for the legal claims. The plaintiffs first negotiated in April of 1980, with John Watson, Zone Manager for Ford's Tractor Operations, for the franchise held by Tunis in Kennett Square. Watson recommended to de la Rigaudiere and Smith that they relocate Tunis Brothers to the Oxford/Cochranville area approximately 10 miles west of Kennett Square. Watson subsequently issued a report in which he recommended that de la Rigaudiere and Smith were qualified for a franchise in the Cochranville area.
 
 
 10
 Displeased with Watson's suggestion, de la Rigaudiere and Smith subsequently met with Eugene Fraher, the Northeastern District Manager of Ford Tractor Operations, in Cohoes, New York in June of 1980. Fraher informed them of Ford's designation of the Kennett Square location as an attrition point, and Ford's plan to establish a franchise in the Cochranville area. As an accommodation to the plaintiffs, however, Fraher promised to consider their application for a Kennett Square franchise for a 2-3 year period of time if they submitted a business plan to him, which they subsequently sent to Fraher. Fraher cautioned them, however, that any purchase of the Tunis Brothers Company should be made contingent upon obtaining the Ford franchise. Nevertheless, after they obtained mortgage financing, Smith and de la Rigaudiere failed to so condition their purchase of Tunis Brothers.
 
 
 11
 On March 3, 1981, Hugh Nickel, dealer replacement representative for the Northern Region of Ford Tractor Operations, and Douglas Crawford, who had succeeded John Watson as the Zone Manager, met with Smith, de la Rigaudiere, and the Tunises at Tunis Brothers. At that meeting Nickel requested that Richard Tunis, as franchise holder, submit an unconditional letter of resignation. The parties dispute whether Nickel represented that this resignation letter would be acted upon with Smith and de la Rigaudiere's franchise application or only after approval of their application. Nickel also took information from Smith and de la Rigaudiere necessary to complete a franchise agreement. The plaintiffs maintain that they informed Nickel of their combined $50,000 investment in the business, however, the application reflected only a $5,000 investment. It is undisputed that Nickel recommended disapproval of the franchise application. The district court's Memorandum Opinion continues:
 
 
 12
 The closing of the sale of Tunis Brothers took place on March 16, 1981, thirteen days after the meeting with Nickel. On March 17th, Richard Tunis sent his letter of resignation and termination notice to Ford, which were forwarded on March 23rd, by Nickel and Fraher, to Market Representation Manager Kenneth E. Harris for immediate action. Harris, however, held the letter pending the processing of plaintiffs' dealership and credit applications.
 
 
 13
 * * * * * *
 
 
 14
 On April 1, 1981, [Howard] Stoneback [, manager of the Philadelphia branch, of Ford Credit,] telephoned Harris to say that Ford Credit would not approve plaintiffs' credit application. On April 2, Richard Tunis was informed by a letter signed by John J.L. Johnson, General Sales Manager of Ford Tractor Operations, that his resignation had been accepted effective immediately. When plaintiffs were informed of this decision, they discovered the erroneous information in their credit application prepared by Nickel. Plaintiffs were subsequently permitted to submit a second credit application containing the correct information. However, before a decision on the revised credit application was reached, plaintiffs' dealership application was rejected. This information was conveyed to plaintiffs by letter dated August 7, 1981 from E.S. Hasel, the Regional Manager for the Northern Region of Ford Tractor who, like Fraher, was a director and senior vice-president of Wenner Ford. Tunis Brothers subsequently became a franchised dealer of Allis-Chalmers farm tractors but is currently in Chapter 11 bankruptcy.
 
 
 15
 District Court Memorandum Opinion Typescript at 11-12.
 
 
 16
 This litigation commenced on December 15, 1982, when Tunis Brothers, de la Rigaudiere and Smith filed their complaint naming as defendants Ford Motor, Ford Credit, Wenner Ford, John S. Wenner and Ford employees John Watson, Douglas N. Crawford, Eugene W. Fraher, E.S. Hasel, Hugh Nickel, Kenneth E. Harris, and C.W. Wenzel. The plaintiffs charged the defendants with a conspiracy to violate several provisions of the antitrust laws, including section 1 of the Sherman Act, 15 U.S.C. § 1; sections 7 and 14 of the Clayton Act, 15 U.S.C. §§ 18 and 24; and with various state law tort and breach of contract claims arising out of Ford's failure to renew the Tunis Brothers Ford tractor franchise upon its sale from Richard and Isabelle Tunis to de la Rigaudiere and Smith. And so began the long and tortuous legal proceedings that again find themselves before our court.
 
 
 17
 During the first round of litigation, in a June 22, 1983 order, the district court dismissed the claims asserted under the Clayton Act for failure to state a claim and the claim against C.W. Wenzel for lack of personal jurisdiction. Tunis Bros. Co. v. Ford Motor Co., No. 82-5557 (E.D.Pa. June 22, 1983). Later, the district court granted summary judgment in favor of all of the defendants on the remaining federal counts, finding that there were no genuine issues of material fact from which a reasonable jury could infer an antitrust conspiracy. Tunis Bros. Co. v. Ford Motor Co., 587 F.Supp. 267 (E.D.Pa.1984).
 
 
 18
 On appeal, we reversed that award of summary judgment, stating that "[v]iewing the evidence in the light most favorable to plaintiffs, we find that the evidence presented supports an inference that the close ties between ... defendants Ford and Wenner Ford led to an illegal agreement, even if implicit." Tunis Bros. Co. v. Ford Motor Co., 763 F.2d 1482 (3d Cir.1985) ("Tunis I" ).
 
 
 19
 On petition for writ of certiorari, the Supreme Court vacated our decision in Tunis I and remanded the case for reconsideration in light of its decision in Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court in Matsushita held that when an antitrust defendant's conduct is consistent with both permissible competition and illegal conspiracy, a plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently" in order to survive a motion for summary judgment. 475 U.S. at 588, 106 S.Ct. at 1356 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)).
 
 
 20
 On remand, we found that the "evidence adduced by [plaintiffs] to satisfy this burden [was] substantial but not overwhelming ..." and further remanded the case to the district court for trial on all counts. Tunis Bros. Co. Inc. v. Ford Motor Co., 823 F.2d 49, 51 (3d Cir.1987) ("Tunis II" ), cert. denied, 484 U.S. 1060, 108 S.Ct. 1013, 98 L.Ed.2d 979 (1988). Pursuant to this remand, the district court bifurcated the trial, commencing the liability portion on November 15, 1988.
 
 
 21
 After all of the liability evidence had been presented, on December 14, 1988, the district court granted the defendants' motion for a directed verdict on counts I, II, III and VI, and also their motion for the dismissal of de la Rigaudiere and Smith as individual plaintiffs.[2] Further, the district court dismissed all of the claims against the Ford employees in their individual capacities before submitting the case to the jury. Thus the only counts that remained were Counts IV and V against Ford Motor, Ford Credit, Wenner Ford, and John S. Wenner. Count IV charged the defendants with a violation of section 1 of the Sherman Act under the rule of reason doctrine. Count V alleged pendent state law claims of fraud, misrepresentation, and tortious interference with contractual relations.
 
 
 22
 Eight special interrogatories were sent to the jury to determine whether the remaining defendants had either conspired to violate section 1 of the Sherman Act under the rule of reason analysis or defrauded Tunis Brothers. In its answers to these interrogatories, the jury found that Ford Motor, Ford Credit and Wenner Ford had conspired to terminate the Tunis Brothers franchise, that the conspiracy had an adverse economic impact on the intrabrand market for Ford tractors in the Kennett Square area, and that the adverse impact on competition outweighed any beneficial competitive effects in that market. The jury also found that Ford Motor and Ford Credit had defrauded the plaintiffs in their attempt to secure a new Ford franchise. The jury exculpated John S. Wenner on all counts.
 
 
 23
 After denying the defendants' motion for a new trial on liability, the district court permitted the damages phase of the trial to commence. On February 1, 1989, the jury returned a verdict of $227,605.50 against Ford Motor, Ford Credit and Wenner Ford on the antitrust claim. In addition, the jury returned a verdict in the same amount against Ford Motor and Ford Credit on the fraud count. The jury apportioned damages for the fraud count in the amount of $159,323.85 against Ford Motor and $68,281.65 against Ford Credit. Finally, the jury awarded punitive damages against Ford Motor in the amount of $2,800,000.00 and against Ford Credit in the amount of $1,200,000.00.
 
 
 24
 In their February 17, 1989, motion for judgment notwithstanding the verdict or in the alternative for a new trial, the defendants alleged that the rulings of the district court were erroneous, that the jury's verdict was against the weight of the evidence, and that the plaintiffs' claims were insufficient as a matter of law. In the alternative, the defendants sought a new trial or a remittitur on damages. The district court denied these motions on September 26, 1990.
 
 
 25
 The parties have filed cross-appeals. Ford Motor and Wenner Ford challenge the denial of their motions for a judgment n.o.v. on both the antitrust and fraud claims. They also challenge the denial of their motions for judgment n.o.v. or alternatively a new trial on both compensatory and punitive damages. Ford Credit, stipulated to be a wholly owned subsidiary of Ford Motor, additionally questions: (1) whether, as a matter of law, it can be capable of conspiring in violation of the Sherman Act with its parent corporation, Ford Motor; (2) the sufficiency of the evidence concerning the conspiracy between Ford Credit and Wenner Ford; and (3) Ford Credit's liability for fraud absent any evidence of misrepresentation by a Ford Credit representative.
 
 
 26
 Tunis Brothers, de la Rigaudiere, and Smith, in their cross-appeal, challenge the orders of the district court that: (1) excluded testimony of two expert witnesses on damages; (2) dismissed de la Rigaudiere and Smith as individual plaintiffs; and (3) denied prejudgment interest.
 
 
 27
 Our appellate jurisdiction is predicated upon 28 U.S.C. § 1291. We turn now to the issues.II.
 
 
 28
 We begin with the challenges of all three Ford defendants to the district court's denial of their motions for judgment n.o.v. with respect to the antitrust verdict. Our review of a request for judgment n.o.v. is governed by the standard set forth in Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 921 (3d Cir.1986), providing that we must determine whether the trial record is "critically deficient of that minimum quantum of evidence" required to allow the jury's verdict to stand. We are mindful that "[w]hen deciding a motion for judgment notwithstanding the verdict, the trial judge must determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." Bhaya v. Westinghouse Elec. Corp., 832 F.2d 258, 259 (3d Cir.1987), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); Berndt v. Kaiser Aluminum & Chemical Sales, Inc., 789 F.2d 253, 258 (3d Cir.1986). "Our review of the application of this standard is plenary." Bhaya, 832 F.2d at 259. The question of relevant market definition is a factual one and "we ... must affirm the jury's conclusion unless the record is devoid of evidence upon which the jury might reasonably base its conclusion." Weiss v. York Hospital, 745 F.2d 786, 825 (3d Cir.1984).
 
 
 29
 To recover under their Sherman Act section 1 claim, under the rule of reason test, the plaintiffs were required to prove: "(1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy." Tunis I, 763 F.2d at 1489; Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72, 81 (3d Cir.1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). We will focus our analysis on the second factor to ascertain whether the evidence adduced at trial pertaining to the relevant product market, the relevant geographic market, and the anti-competitive effects supports the verdict. Because we conclude that the plaintiffs failed to prove these prerequisites, it will not be necessary for us to address the first, third and fourth requirements.
 
 A. Relevant Product Market
 
 30
 The defendants contest the jury's finding, recorded in its interrogatory answers, that the relevant product market consisted solely of Ford tractors. According to the Ford defendants, even when viewed through the eyes of Tunis Brothers' predominant customers--mushroom growers--the relevant product market consists of Ford, Massey Ferguson, Case and John Deere tractors of comparable size, price and features.
 
 
 31
 The relevant product market is defined as those "commodities reasonably interchangeable by consumers for the same purposes." United States v. E.I. Du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1062-63 (3d Cir.), cert. denied, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Factors to be considered include price, use and qualities. Du Pont de Nemours, 351 U.S. at 404, 76 S.Ct. at 1012. Accordingly, the products in a relevant product market would be characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market. Id. at 380, 400, 76 S.Ct. at 998, 1009. Here, the products that were under consideration by the jury were those which the local farmers--predominantly mushroom farmers--purchased for their agricultural needs.
 
 
 32
 It is clear that the Supreme Court has placed a heavy emphasis on interbrand competition in such cases as Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) and Continental T.V. Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Although the Supreme Court has recognized that the reduction of intrabrand competition through the use of vertical restrictions might actually promote interbrand competition, see GTE Sylvania, Inc., 433 U.S. at 52-54, 97 S.Ct. at 2558-59, nevertheless, the Supreme Court has reconfirmed that "[o]ur approach ... is guided by the premises of GTE Sylvania and Monsanto: ... that interbrand competition is the primary concern of the antitrust laws...." Business Electronics, 485 U.S. at 726, 108 S.Ct. at 1521. The emphasis of antitrust theory is thus upon protecting interbrand competition.
 
 
 33
 Nonetheless, it is also true that a well-defined submarket may constitute a relevant product market and so under certain circumstances a relevant product market could consist of one brand of a product, placing intrabrand competition at issue. In Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), the Supreme Court, in addressing a merger in violation of section 7 of the Clayton Act, sought to determine the product market and stated:
 
 
 34
 [W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.
 
 
 35
 Brown Shoe, 370 U.S. at 325, 82 S.Ct. at 1523 (citation and footnote omitted). Special characteristics of the relevant industry may influence market definition. Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 28 (3d Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).
 
 
 36
 Therefore, in considering the highly factual issue of whether there is a cross-elasticity of demand between Ford tractors and other tractors, we have examined prior cases in which relevant product markets have been defined. In United States v. E.I. Du Pont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the Supreme Court decided that the relevant market for cellophane was broader than cellophane only, and consisted of other interchangeable flexible packaging goods. The Court found that the cellophane market was not distinct from the market for flexible packaging materials and that at all times du Pont competed with the manufacturers of these other flexible packaging goods. Consequently, the relevant product market was not limited to cellophane alone, but encompassed other interchangeable flexible packaging goods.
 
 
 37
 More to the point, in Mogul v. General Motors Corp., the district court concluded that a Cadillac automobile was not "so unique" as alone to constitute a relevant product market. 391 F.Supp. 1305, 1313 (E.D.Pa.1975), aff'd without opinion, 527 F.2d 645 (3d Cir.1976). A Cadillac is "interchangeable with other luxury automobiles ... [and] competes with even the less expensive models of automobiles in serving the consuming public's transportation needs and desires." Id. Therefore, the court granted summary judgment in favor of General Motors because although the plaintiff, who was seeking a Cadillac dealership, may have suffered an injury, there was no injury to competition because other car dealerships were still available to potential consumers. See also R.D. Imports Ryno Indus., Inc. v. Mazda Distrib. (Gulf), Inc., 807 F.2d 1222, 1225 n. 2 (5th Cir.) (Mazda does not constitute relevant market as Mazdas have "a variety of domestic and foreign substitutes"), cert. denied, 484 U.S. 818, 108 S.Ct. 75, 98 L.Ed.2d 38 (1987); Kingsport Motors, Inc. v. Chrysler Motors Corp., 644 F.2d 566, 571 (6th Cir.1981) (in a tying case, the relevant product market "is the sum total of medium priced automobiles manufactured by Chrysler and all other automobile manufacturers and sold in the United States"); Packard Motor Car Co. v. Webster Motor Car Co., 243 F.2d 418, 420 (D.C.Cir.) (no exclusively Packard relevant product market), cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); Merit Motors, Inc. v. Chrysler Corp., 417 F.Supp. 263, 269 (D.D.C.1976) (no exclusively Chrysler relevant product market), aff'd, 569 F.2d 666 (D.C.Cir.1977).
 
 
 38
 We find these cases to be instructive.[3] Clearly, the plaintiffs had the burden of proving that Ford tractors constituted the entire relevant market and that other tractors available for sale were not "reasonably interchangeable." To this end, the plaintiffs presented evidence primarily through the testimony of Richard Tunis, Richard de la Rigaudiere, David Smith, several local mushroom farmers, and Jacob Dudkewitz, a tractor dealer from the nearby town of West Grove, Pennsylvania. By looking, as we must, at the facts in the light most favorable to the plaintiffs, we find that although the mushroom farmers voiced their preference for Ford tractors, their own testimony established strong interbrand competition. The mere incantation of a "Ford tractor only" relevant product market does not satisfy that minimum quantum of evidence necessary to uphold the jury's verdict.
 
 
 39
 Richard Tunis, one of the original owners of Tunis Brothers, testified at length about the attributes of the Ford tractor and the mushroom farmers' preference for Ford's light industrial tractors. Tunis stated that he originally sold Allis-Chalmers tractors, which were "wonderful," but that because the mushroom farmers "wanted ... a low, compact tractor with a loader on it that could turn their compost, and Allis-Chalmers didn't make anything like that," Tunis sought a Ford franchise. A Ford dealership was not available at that time, however, so he sold Massey Ferguson tractors which were "almost similar to the Ford which the mushroom growers did like but not as good as Ford." In describing the Ford tractor, Tunis said that "it was compact; it had a good loader on the front of it. It was much better than the Allis-Chalmers, which was a high, clumsy tractor built so that you could cultivate corn with it." On the other hand, Tunis admitted that "Ford wasn't the only manufacturer that sold a light or medium industrial tractor that a customer might find useful" and that Massey Ferguson and Allis-Chalmers produced tractors that were "in the same general category."
 
 
 40
 David Smith testified that he gained extensive knowledge concerning the tractor preference of mushroom farmers while he worked for Fert-L Soil, his soil company, as he travelled to mushroom farms in an effort to purchase their compost. Selling in a very limited geographical area, ranging chiefly between Kennett Square and Toughkenamon, Smith stated that most of the farmers he saw had Ford tractors. He estimated that among the 40 farms that he visited, he saw approximately 30 tractors, of which 25 were manufactured by Ford. By the same token, Smith admitted that "mushroom growers did buy tractors from other people, you know, manufacturers." When Tunis Brothers was denied a Ford dealership, Smith chose to seek an Allis-Chalmers dealership rather than one from Massey Ferguson or John Deere, both of which made light industrial tractors, because too many Massey Ferguson and John Deere dealerships were located near Tunis Brothers. Furthermore, Smith admitted that John Deere and Massey Ferguson were competitors of Ford, and Case also sold tractors to mushroom growers. In their application for a Ford franchise, Smith and de la Rigaudiere listed dealers of three brands that they considered to be their competitors: Massey Ferguson, International Harvester, and White.
 
 
 41
 The majority of the testimony regarding the relevant product market was elicited from several local mushroom farmers. Joseph DiNorscia III testified that he had a good relationship with Tunis Brothers, but that among the five tractors he owned, four were Massey Fergusons and only one was a Ford, which he bought from Wenner Ford's predecessor. Moreover, he did not believe that he used Tunis Brothers to service his tractors.
 
 
 42
 Mushroom farmer Peter Alonzo testified that he had two Ford tractors (one of which was purchased in used condition from a neighboring farmer) and one Case tractor. Alonzo previously owned Massey Ferguson and Allis-Chalmers tractors. On cross-examination he confirmed that in 1983, he owned three Ford tractors, one Massey Ferguson, one Allis-Chalmers and one Kaboda.
 
 
 43
 Lawrence T. Parrish Jr. testified that he owned three Ford tractors, one Allis-Chalmers tractor and a Massey Ferguson, all of which were purchased after 1978. He also stated that his business relationship with Tunis Brothers was good. With respect to his Allis-Chalmers tractor, Parrish opined that "[i]t's not cut out for the mushroom industry. It's too big, too cumbersome, but it did do the job eventually."
 
 
 44
 Ernest P. Martelli took the stand and stated that he owned three Fords and one Case tractor. Martelli admitted that he bought the Case after he priced it against a comparable Ford and found the Case to be less expensive.
 
 
 45
 The last mushroom farmer to testify, Stephen P. Vincenti, owned two Fords and one Case tractor and stated that he purchased the Case after pricing it against comparable but more expensive Ford tractors. Describing the Case as a farm tractor, Vincenti nevertheless pointed out that "it is still [used as] ... a function of the mushroom business."
 
 
 46
 Jacob Dudkewitz, the owner of the farm equipment dealership "S.G. Lewis and Son," also provided testimony regarding the relevant product market. Dudkewitz, a Massey Ferguson dealer, stated that his company sold to mushroom, dairy and grain farmers and had 85 to 90 percent of the mushroom growers market. Moreover, according to a survey made by his company in 1972, it had sold approximately 2,200 Massey Ferguson tractors to mushroom farmers. Dudkewitz also considered his major competition in the mushroom industry to be Case and in the agricultural industry to be John Deere. Finally, he asserted that the owners of large mushroom farms were shifting away from using smaller, more maneuverable tractors to purchasing large tractors made by Caterpillar, Michigan, Huff, John Deere and Case.
 
 
 47
 Clearly the evidence adduced at trial does not support the jury's finding of an exclusively Ford tractor market even when viewing the evidence in the light most favorable to the plaintiffs. Assuming that mushroom farmers only wished to purchase low, compact tractors such as Ford produced and disregarding the testimony of the plaintiffs' own witness, Dudkewitz, concerning the mushroom farmers' increasing use of large tractors, a plethora of testimony confirmed that Massey Ferguson, Case and John Deere produced tractors comparable to Ford that competed against Ford tractors in the mushroom farmer market. Each of the mushroom farmers who testified for the plaintiffs admitted that they owned tractors other than Ford.
 
 
 48
 Furthermore, the evidence did not support the jury's finding of a Ford tractor only product market; rather, the evidence demonstrated a cross-elasticity of demand between Ford tractors and comparable tractors. Both Martelli and Vincenti testified that they bought comparable Case tractors because these cost less than Ford tractors. Smith and de la Rigaudiere also recognized this cross-elasticity of demand when they listed competitor non-Ford tractor dealers on their franchise application.
 
 
 49
 At best, the evidence suggests that mushroom farmers preferred the Ford tractor. Nonetheless, these same farmers did not buy Ford tractors exclusively and demonstrated sensitivity to price. Because the testimony does not indicate that the relevant product market was limited only to Ford tractors, we conclude that the relevant product market consisted of Ford and other comparable tractors.
 
 B. Relevant Geographic Market
 
 50
 The plaintiffs asserted, and the jury so found, that the relevant geographic market comprised only the Kennett Square area, an oddly configurated area stretching 6.36 miles east, 7 miles west, 11.45 miles north and 10 miles south of the Tunis Brothers location. Not surprisingly, the record indicates that Tunis Brothers was the only tractor dealership within this area.
 
 
 51
 As with the relevant product market, the plaintiffs bore the evidentiary burden of proving the relevant geographic market. Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pa., 745 F.2d 248, 260 (3d Cir.1984), cert. denied, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). "The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks[.]" Id. (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966)); see Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327, 331-32, 81 S.Ct. 623, 628, 630, 5 L.Ed.2d 580 (1961) (defining the relevant geographic area as "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies" or as the area in which suppliers "effectively compete"). Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product. Further, the size of the relevant geographic market will differ depending upon the price, durability and size of the product; in practical terms, one would comparison shop in a larger geographic market for a tractor, as compared to a grocery item.
 
 
 52
 The plaintiffs' exhibit, depicting the Kennett Square Area, identifies concentrations both of mushroom farmers' workplaces and Tunis Brothers' customers' residences. These customers testified, however, that they did not limit themselves to such a restricted geographic region either when purchasing tractors or seeking service. In point of fact, each one of these mushroom farmers had purchased at least one tractor from outside the suggested Kennett Square geographical area. Once again, even viewing the evidence in the light most favorable to the plaintiffs, we conclude that the relevant geographical market is clearly broader than the Kennett Square area.
 
 
 53
 Mushroom farmer Alonzo stated, with respect to the convenience of Tunis Brothers, that "being close always helps because it takes less time out of your workday to get your repairs and pick up your material." Nevertheless, he admitted that he also purchased parts from, and had his previous Massey Ferguson tractor serviced by, S.G. Lewis in West Grove, which is outside the plaintiffs' Kennett Square area. Moreover, despite the fact that Alonzo testified that the location of Tunis Brothers and its proximity were beneficial, he had also purchased a Case tractor from a dealer in Delaware. Alonzo further noted that there were a number of mushroom growers from southern Chester County who had been omitted from the narrowly circumscribed area described by the plaintiffs as the Kennett Square area. Finally, Alonzo stated that if Tunis Brothers were located in Cochranville, which also is outside the Kennett Square area, he would still have gone there to buy parts, equipment, tractors and service.
 
 
 54
 Farmer Ernest Martelli testified that he had purchased one tractor in Rising Sun, Maryland, another in Quarryville, Pennsylvania, which is outside of Lancaster County, and had dealt with Wenner Ford in Concordville. Farmer Stephen Vincenti testified that he had purchased a tractor from A.L. Herr in Lancaster and had done business with Wenner Ford. Another farmer, Lawrence Parrish, after prodding on cross-examination, admitted that he might go to Cochranville to buy from Tunis Brothers if it were to move there, especially given his long-standing relationship with Tunis Brothers and the fact that his farm was equally distant from Wenner Ford and Cochranville.
 
 
 55
 Massey Ferguson dealer Jacob Dudkewitz testified that the geographic area in which he sought customers consisted of a 25 mile radius stemming from his place of business in West Grove, Pennsylvania, that included the Kennett Square Area. He sought and transacted business in such diverse areas as "Cecil County, Maryland, New Castle County, Delaware, on and around the Philadelphia area, Coatesville, Downington and to the Lancaster County line and back to the Cecil County line in Maryland." Clearly, Dudkewitz, a competitor of Tunis Brothers, considered his actual and potential customers to be located in a much larger geographic area.
 
 
 56
 Moreover, Smith's and de la Rigaudiere's own actions indicated that they were not planning to confine their geographic market. In their Ford Franchise application, they listed three dealers, which they considered to be their competitors, that were located within a 20 mile radius of Tunis Brothers. Like Dudkewitz, the plaintiffs explained that they intended to pursue sales beyond the rigid confines of the "Kennett Square area" as delineated on their trial exhibit. They had contacted the Ford dealer in Rising Sun, Maryland, whose outstanding letter of intent to resign his dealership awaited only retirement and another Ford franchise's takeover of his territory, to reach an informal agreement that Tunis Brothers would cultivate sales in that territory pending his retirement. Moreover, Smith testified at some length that Fert-L Soil salesmen would be commissioned to sell Fords for Tunis Brothers, and one of those salesmen, Martin Futyma, testified that he would have sold for Tunis Brothers in his New Jersey territory.
 
 
 57
 Thus plaintiffs' evidence did not establish that the relevant geographic market was limited to the Kennett Square area. Rather than eliciting testimony to indicate that customers, when seeking services or purchasing tractors, limited themselves to the Kennett Square area, the plaintiffs' witnesses were merely asked, when shown the outlined area on a map, "Is this what you would call the Kennett Square area?" By agreeing only that the circumscribed area constituted the Kennett Square area, the witnesses did not confirm that that area constituted the relevant geographic area in which those customers sought to buy or obtain service for tractors but merely indicated that the outlined area was what they would "call" the Kennett Square area. In fact, farmer Stephen Vincenti, on cross-examination, admitted that the Kennett Square area, as outlined by the plaintiffs, was "generally the Kennett Square area, not necessarily where it pertains to mushroom growers." The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market.
 
 C. Injury to Competition
 
 58
 Having determined that the appropriate product market consists of Ford tractors and all comparable tractors that compete with Ford, and that the geographic market is greater than the limited Kennett Square area as defined by the plaintiffs, we conclude that the plaintiffs have failed to show that Ford Motor exercised market power. Therefore, they have also failed to show that Ford Motor caused an unreasonable restraint of trade that implicated an injury to competition. It is axiomatic that "[t]he antitrust laws ... were enacted for 'the protection of competition, not competitors.' " Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original)). As we stated in Sitkin Smelting and Ref. Co. v. FMC Corp., 575 F.2d 440, 448 (3d Cir.), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978),
 
 
 59
 In applying the rule of reason standard, courts are called upon to judge shades and gradations of competitive impact. The standard for determining what combinations involve the prohibited degree of harm is nowhere spelled out in specific terms. It is clear, however, that plaintiffs have a burden to show more than a de minimus restraint.
 
 
 60
 The Sherman Act was designed to prohibit significant restraints of trade rather than to "proscribe all unseemly business practices;" id. at 448; see Apex Hosiery Co. v. Leader, 310 U.S. 469, 493 n. 15, 60 S.Ct. 982, 992 n. 15, 84 L.Ed. 1311 (1940); and the plaintiffs must have demonstrated some harm to the competitive landscape from Ford Motor's termination of the Tunis Brothers franchise. Cf. Tose v. First Pennsylvania Bank, N.A., 648 F.2d 879, 892 (3d Cir.) (nothing in "nature or character of the alleged conduct or its surrounding circumstances to support an inference that it was intended or likely to restrain trade or enhance prices"), cert. denied, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality "of goods or services."
 
 
 61
 Although the plaintiffs did elicit some minimal testimony indicating that the prices for Ford products at Wenner Ford were high in comparison to the other products such as Case tractors, they never demonstrated that Wenner Ford's prices rose after Tunis Brothers was denied its Ford franchise. In addition, there was some evidence that the service and credit terms offered by Wenner Ford to mushroom farmers were less desirable than those offered by Tunis Brothers. Nevertheless, this testimony amounted to no more than some customer dissatisfaction with the loss of "friendliness" that customers of Tunis Brothers had appreciated and did not demonstrate, nor does it support a jury inference of, any discernible injury to competition.
 
 
 62
 Furthermore, since the primary goal of antitrust law is to protect interbrand competition, the evidence from certain mushroom farmers that they were able to purchase comparable, different brands of tractors at lower prices indicates that neither the availability of other brands nor the price of products was affected negatively. Additionally, because these same witnesses testified that other brands they purchased were comparable, neither was quality affected. On this evidence, we conclude that the plaintiffs failed to prove that the termination of Tunis Brothers' Ford franchise constituted an antitrust violation because mushroom farmers were still able to purchase comparable tractors at competitive prices. Therefore we will reverse and remand this appeal for the district court to grant judgment n.o.v. in favor of all of the defendants on the antitrust claim.
 
 
 63
 Because we ground our reversal of the antitrust claim upon the plaintiffs' failure to demonstrate adequately any injury to competition, we need not reach the additional antitrust issues raised by Ford Credit. We leave to another day a resolution of the legal question posed by Ford Credit and Wenner Ford--whether a wholly- or majority-owned subsidiary and its parent corporation can conspire in violation of the Sherman Act.[4] In addition, Ford Motor's assertion that the district court erred in declining to give a Matsushita charge to the jury on the antitrust claim is likewise mooted. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[5]
 
 III.
 A.
 
 64
 We turn now to the jury's determination that Ford Motor and Ford Credit induced the plaintiffs to act through fraudulent misrepresentations. We are asked to consider whether a judgment n.o.v. should have been granted in favor of the defendants. In looking at all of the evidence relating to the alleged fraud in the light most favorable to the plaintiffs, we once again adopt the narrative of the district court as our own.
 
 
 65
 [At the commencement of] their negotiations for the purchase of Tunis Brothers, de la Rigaudiere and Smith contacted John Watson, Zone Manager for Ford's Tractor Operations in the area including Kennett Square and Concordville. At the suggestion of Watson, de la Rigaudiere and Smith met Watson at Wenner Ford on May 23, 1980. They were introduced to John Wenner and given a tour of his facility. Watson, de la Rigaudiere and Smith proceeded to lunch at the Concordville Inn where Watson informed them that Ford did not wish to renew the Tunis Brothers dealership in Kennett Square after its sale or the retirement of Richard Tunis and that the Kennett Square market was slated for Wenner Ford. Watson recommended that plaintiffs consider opening a dealership in Oxford, or Cochranville, Pennsylvania, located about fifteen miles west of Kennett Square. The record shows that John Wenner was sitting at a nearby table during this discussion. Watson subsequently wrote in his Ford New Dealer Prospecting Report that plaintiffs were qualified to operate a Ford franchise in the Oxford/Cochranville area.
 
 
 66
 Skeptical of Watson's motives regarding Wenner Ford, plaintiffs contacted his superior Eugene Fraher, the Northeastern District Manager of Ford Tractor Operations. Plaintiffs met with Fraher and his assistant Edward Poole, on June 13, 1980 in Fraher's office in Cohoes, New York. Fraher confirmed that the Kennett Square dealership was an attrition point but told plaintiffs they could possibly remain in Kennett Square for two to three years, after which time they would be required to move to Cochranville. Fraher gave them dealer applications and told them to submit a business plan to him. He also warned them that any purchase of Tunis Brothers should be made contingent upon Ford's approval of their business plan. What Fraher did not disclose was that his duties at Ford included oversight of Ford Dealer Development companies in his territory and that he was then a Director and Senior Vice-President of Wenner Ford.
 
 
 67
 Plaintiffs obtained mortgage financing for the purchase of Tunis Brothers through the Chester County Industrial Development Authority and on December 16, 1980 signed an Agreement of Sale with Richard and Isabelle Tunis. It is undisputed that this agreement did not take into account Fraher's admonition making the sale contingent on Ford's approval of the franchise. In January 1981, plaintiffs sent these materials, along with their business plan and dealer applications, to Fraher and Douglas Crawford, who had succeeded Watson as Ford's Zone Manager.
 
 
 68
 On March 3, 1981, Crawford and Hugh Nickel, Dealer Replacement Representative for the Northern Region of Ford Tractor Operations, met with de la Rigaudiere, Smith and Richard and Isabelle Tunis at Tunis Brothers. Plaintiffs testified that Crawford stated they were sent by Fraher. Nickel explained that Ford would not process an application for a replacement dealer unless the present dealer submitted a letter of resignation. Nickel presented Richard Tunis with a form letter of unconditional resignation and a termination notice for Richard Tunis to send to Ford. Nickel told them, in a representation which forms the core of plaintiffs' claim of fraud, that the resignation letter would not be processed until the new dealership application was approved but, instead, would be "held in a drawer." Nickel also recorded plaintiffs' financial information and had de la Rigaudiere and Smith sign blank credit applications which he claimed would be typed up at his office and returned to plaintiffs for their review.
 
 
 69
 Plaintiffs were not sent copies of this first completed application which misstated plaintiffs' investment in Tunis Brothers. Smith and de la Rigaudiere were to invest $25,000.00 each in the dealership for a total investment of $50,000.00. The credit application prepared by Nickel reflected only a $5,000.00 investment in the business. Plaintiffs further testified that no mention of the move to Cochranville was made at this meeting. Despite his assurances that plaintiffs would be approved, Nickel's New Dealer Prospecting Report stated that de la Rigaudiere and Smith were not qualified businessmen and did not have adequate financing to be approved for credit.
 
 
 70
 The closing of the sale of Tunis Brothers took place on March 16, 1981, thirteen days after the meeting with Nickel. On March 17 Richard Tunis sent his letter of resignation and termination notice to Ford, which were forwarded on March 23 by Nickel and Fraher to Market Representation Manager Kenneth E. Harris for immediate action. Harris, however, held the letter pending the processing of plaintiffs' dealership and credit applications.
 
 
 71
 After receiving Nickel's letter of March 23rd and the plaintiffs' application, Stoneback of Ford Credit telephoned Nickel in the presence of his Assistant Branch Manager Harry Saxton. Saxton prepared a chronology of subsequent events. Under an entry dated "4/81," Saxton wrote:
 
 
 72
 Branch received the file from T & I [Tractor and Implementations] on subject dealer [Tunis Brothers]. It reflected the replacement Principals and $5,000.00 total investment on Pro-Forma and also reflected $400M Mortgage loan, $168M negative net worth. Branch discussed prospective dealer file with Hugh Nichol [sic] of T & I who confirmed a small $5,000.00 investment. He also stated that T & I was not confident the two principals could sell enough equipment to generate profits to repay the $400M note. He also implied that T & I did not want the deal approved. He also stated that the transfer of the dealership ownership without T & I approval was reason for the franchise to be terminated.
 
 
 73
 (Emphasis added.) Although Stoneback did not recall this conversation and Nickel, in deposition, expressly denied confirming the inaccurate $5,000.00 investment, the jury obviously believed Saxton's chronology and supporting testimony.
 
 
 74
 District Court Memorandum Opinion Typescript at 8-12.
 
 
 75
 In addition to this evidence, there was testimony by Jacob Dudkewitz, the Massey Ferguson dealer in West Grove, which, if credited by the jury, supported the plaintiffs' theory that the taking of their application for a franchise served only as a ruse to obtain Richard Tunis's resignation. Dudkewitz testified that he negotiated with Watson and Crawford for a Ford tractor franchise as early as October 11, 1980, which was subsequent to the Cohoes, New York, meeting between Fraher and the plaintiffs and prior to Nickel's acquisition of Tunis's resignation. Dudkewitz testified that at that meeting, in response to his query about Tunis Brothers, Watson explained that Tunis Brothers' franchise would soon terminate and not be renewed. During these negotiations, which continued until February or March of 1981, according to Dudkewitz, Ford assured Dudkewitz that he could carry any Ford product lines, including the large loader he specifically desired.
 
 
 76
 Moreover, at one point Dudkewitz inquired whether Wenner Ford was a "company store"[6] and Nickel, although he had been involved in Wenner Ford's previous conversion to a dealer development franchise, unequivocally informed Dudkewitz that Wenner Ford was "independently privately owned." Dudkewitz explained that negotiations broke off just prior to a signing of the franchise agreement; Ford withdrew its promise to supply him with the large four-wheel drive unit he had been promised, because, according to Crawford, Wenner Ford carried that item.
 
 
 77
 From this evidence, the jury could certainly have chosen to disbelieve the exculpating testimony of the defendants in favor of the testimony of the plaintiffs' witnesses. We cannot disturb the verdict insofar as it reflects a judgment on the credibility of the plaintiffs and the plaintiffs' version of events versus, for example, the versions given by Nickel, Crawford and Fraher.
 
 B.
 
 78
 In order to prove a claim of fraudulent misrepresentation under Pennsylvania law, which all the parties agree governs, the plaintiffs were required to prove: (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will be induced to act; (4) justifiable reliance on the misrepresentation; and (5) damage to the recipient as a proximate result. Scaife Co. v. Rockwell-Standard Corp., 446 Pa. 280, 285, 285 A.2d 451, 454 (1971), cert. denied, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972); Smith v. Renaut, 387 Pa.Super. 299, 306, 564 A.2d 188, 192 (1989); Delahanty v. First Pennsylvania Bank, N.A., 318 Pa.Super. 90, 464 A.2d 1243 (1983).
 
 
 79
 Each element of the claim must be proven by clear and convincing evidence. Scaife, 446 Pa. at 285, 285 A.2d at 454. The Pennsylvania Supreme Court has elaborated on those actions which would constitute fraudulent behavior: " 'fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It is any artifice by which a person is deceived to his disadvantage.' " In re McClellan's Estate, 365 Pa. 401, 407, 75 A.2d 595, 598 (1950) (quoting In re Reichert's Estate, 356 Pa. 269, 274, 51 A.2d 615, 617 (1947)); Delahanty, 318 Pa.Super. at 107, 464 A.2d at 1251 (citing Frowen v. Blank, 493 Pa. 137, 425 A.2d 412 (1981)). A fraud also occurs when one is induced to assent when he would not otherwise have done so. Delahanty, 318 Pa.Super. at 107, 464 A.2d at 1251-52. Fraudulent misrepresentation may be accomplished "by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment." Id. at 108, 464 A.2d at 1252.
 
 
 80
 The Ford defendants argue that the plaintiffs failed to prove that a misrepresentation was made upon which the plaintiffs could have reasonably relied. To the contrary, examining the evidence in the light most favorable to the plaintiffs, we conclude that the trial record is replete with clear and convincing evidence which supports the jury's finding of fraud against Ford Motor.
 
 
 81
 Richard Tunis, his wife Isabelle Tunis, Smith and de la Rigaudiere testified as to the events which gave rise to their claim of fraud. Each of these individuals essentially corroborated one another's testimony with respect to a meeting that transpired with two employees of Ford Motor. On March 3, 1981, de la Rigaudiere, Smith, and the Tunises met with Douglas Crawford and Hugh Nickel. According to their testimony, Nickel insisted that Richard Tunis would be required to submit an unconditional letter of resignation as soon as he consummated the sale of the business with Smith and de la Rigaudiere. Nickel then produced a proposed form letter which they were to prepare on Tunis Brothers' letterhead. He indicated that the completed letter should be sent to him at Ford Motor immediately after the consummation of the sale of the business. According to the plaintiffs, Nickel then assured them that the unconditional letter of resignation would be "stuck in a drawer" and would not be acted upon until after de la Rigaudiere and Smith were approved as dealers. Additionally, according to the plaintiffs, Nickel assured them that their application would be approved.
 
 
 82
 Nickel also produced a blank application for credit, which he insisted that de la Rigaudiere and Smith sign, stating that rather than risk delay and the possibility of error in filling out the applications, Nickel preferred to gather the information and have his secretary type the form. This would ensure, he stated, an expedited approval process. Nonetheless, although Smith and de la Rigaudiere informed Nickel that their investment in the company would total $50,000, consisting of $25,000 apiece, Nickel recorded a total investment of only $5,000, or $2,500 apiece. According to the Saxton chronology, Nickel confirmed to Stoneback of Ford Credit a total of only $5,000. Because Nickel never sent a copy of the typed application to the plaintiffs for their review as he promised, Smith and de la Rigaudiere did not become aware of this understatement until after Ford Motor's denial of their initial credit application.
 
 
 83
 Toward the end of the meeting, Smith and de la Rigaudiere expressed their concern as to how they would be able to continue to order tractors and tractor parts. Nickel assured them that they could continue purchasing equipment under Richard Tunis's existing credit line since, as he had mentioned, the resignation letter would not be acted upon until they were accepted. Nickel then welcomed them as dealers, but forwarded Richard Tunis's resignation letter for immediate action.
 
 
 84
 Further testimony in support of the plaintiffs' theory came from Harold Saxton, a Ford dealer regional manager. Contrary to the assertions by the defendants that the credit application was denied because of a poor credit rating, Saxton testified that Tunis Brothers had a favorable record and good debt ratio. Saxton's written chronology indicated that Nickel implied to Stoneback that he, Nickel, did not want the Tunis Brothers Ford franchise to survive Richard Tunis's retirement.
 
 
 85
 The Ford defendants counter that any loss sustained by the plaintiffs resulted from their decision, contrary to Fraher's explicit advice, not to condition the purchase of Tunis Brothers upon the acquisition of the Ford franchise. This failure, they posit, rather than any fraudulent misrepresentation on the part of the Ford defendants, accounts for the plaintiffs' misfortune because Ford Motor did not owe any obligation to the plaintiffs to grant Tunis Brothers a franchise. Instead, the Ford defendants assert, Ford Motor denied that franchise for sound business reasons, namely, that Tunis Brothers would be undercapitalized and heavily burdened by mortgage debt.
 
 
 86
 The jury credited the plaintiffs' equally highly plausible account that even though the unconditional sales agreement was reached in December of 1980, the closing did not occur until after the pivotal meeting with Nickel on March 3, 1981, when Smith and de la Rigaudiere believed that they would be approved by Ford Motor. Smith testified that because this sale was a "family affair," both he and de la Rigaudiere could have reneged on the sales agreement had the franchise been disapproved. Further, had Ford Motor believed otherwise, its insistence upon an unconditional letter of resignation from Richard Tunis, rather than a "letter of intent" pending retirement, would not have made sense. The jury could have reasonably inferred from its conduct that Ford Motor recognized that because the sales agreement was a "family affair," and therefore not likely to be legally enforced until after the closing, Tunis's resignation would need to be obtained without disrupting the pending sale. That Ford Motor could terminate a franchise at any time upon a sixty day notice period does not negate this inference because Fraher testified that Ford customarily chooses not to terminate older long-term dealerships selected for attrition, but prefers instead to reward those dealers by deferring attrition until after the dealer's voluntary retirement.
 
 
 87
 Moreover, the testimony was sharply conflicting as to whether Tunis intended to retire in the event that the plaintiffs did not obtain the Ford franchise. A memorandum handwritten by Ed Poole of Ford Motor recorded his telephone conversation with Richard Tunis and de la Rigaudiere and reflected that Tunis intended to retire and de la Rigaudiere intended to buy Tunis Brothers regardless of the availability of the franchise. Tunis and de la Rigaudiere categorically denied conveying any such intentions, and Smith confirmed that he would not have sought to purchase Tunis Brothers without the Ford franchise, opining that Tunis Brothers' hardware business alone would not suffice to support Smith's and de la Rigaudiere's families.
 
 
 88
 This evidence clearly supports the jury's determination that Ford Motor committed a fraud against the plaintiffs. Notwithstanding Ford Motor's assertion that it warned Smith and de la Rigaudiere not to go through with any deal unless it were conditioned upon their acceptance as a dealership, sufficient evidence was adduced at trial to create a jury question. Furthermore, although Ford Motor argues that a second dealer application was handled without incident, we do not agree that its effect was to moot the fraud which was found to taint the initial application for the reason that Ford Motor had already acquired Richard Tunis's resignation.
 
 C.
 
 89
 A different result is required with respect to the fraud verdict against Ford Credit, because as a matter of law, the plaintiffs have not established that Ford Credit perpetrated a fraud on the plaintiffs. There is no evidence in the record to substantiate the plaintiffs' claim that Ford Credit made any misrepresentation. Neither Nickel nor Crawford, both employed solely by Ford Motor, represented themselves as Ford Credit employees or agents during the March 3rd meeting. Only Isabelle Tunis stated that she had thought Nickel was from Ford Credit, but she admitted that she later learned that he was an employee of Ford Motor Company.
 
 
 90
 Moreover, for purposes of apparent authority, there is no evidence that Ford Credit, as the principal, made any representations that Nickel, as an alleged agent, had any authority to act on its behalf. See, e.g., Edwards v. Born, Inc., 792 F.2d 387, 390 (3d Cir.1986); Amritt v. Paragon Homes, Inc., 474 F.2d 1251, 1252 (3d Cir.1973); Restatement (Second) of Agency, §§ 8, 27; see also Bolus v. United Penn Bank, 363 Pa.Super. 247, 261, 525 A.2d 1215, 1222 (1987) ("... in determining the apparent authority of an agent we must look to the actions of the principal, not the agent ..."), alloc. denied, 518 Pa. 627, 541 A.2d 1138 (1988). De la Rigaudiere, himself, testified that Nickel was an employee at Ford Tractor. Accordingly, because there is no evidence to suggest that Ford Credit committed any fraud against the plaintiffs, we will reverse the judgment against Ford Credit on the fraud count, remanding this issue to the district court for judgment to be entered in favor of Ford Credit.
 
 IV.
 
 91
 Ford argues that judgment n.o.v. or in the alternative for a new trial on damages should be granted because of errors in the jury's determination of compensatory damages. Since we have already concluded that the antitrust claim must fail for lack of proof, we shall limit our analysis to the damages arising from the fraud claim against Ford Motor. In this regard, the defendants raise numerous contentions that are both substantive and related to alleged discovery abuses. We conclude that a new trial will be required on the issue of damages related to the fraud count. Thus, we will not address the merits of the discovery-related contentions; we trust that during any ensuing discovery, all documentation underlying the plaintiffs' proof of damages will be timely and adequately produced, and that notice of the identity of all expert witnesses will be timely given.[7] We take up the remainder of the defendants' challenges seriatim. We review the district court's denial of the motion for judgment n.o.v. to determine whether there is sufficient evidence in the record to sustain the verdict on compensatory damages. See National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491, 495 (3d Cir.1987).
 
 
 92
 We will consider first whether there was sufficient evidence to support the jury's selection of a ten year period of time for the damage calculation. Second, we will consider the scope of lost profits compensable for fraud, specifically whether the plaintiffs are entitled to recoup lost gross profits rather than net profits. Third, we will examine whether the evidence was sufficient to support the plaintiffs' claim for compensatory damages.
 
 A.
 
 93
 To set the stage for the discussion that follows, we offer a brief explanation of the method used by the plaintiffs' expert, Morton Oxman, to calculate compensatory damages for both the antitrust and fraud claims. Oxman first calculated average gross profit percentages for both tractor and hardware sales for the last four years, from 1977 through 1980, that Richard Tunis managed Tunis Brothers. To that average, Oxman sought to compare de la Rigaudiere and Smith's performance during 1981--the year Oxman determined would provide the most reliable base year. The choice of this base year required that the amount of gross sales and gross profit margin be projected because the Ford franchise was terminated in early April 1981, so that Tunis Brothers did not have Ford sales for the latter three-quarters of 1981.[8] Oxman premised the Ford tractor sales projections for 1981 upon actual hardware sales for 1981, providing as his only reason for doing so the youth and energy of the new management--a factor constant to both Ford and hardware sales. Because the hardware sales in 1981 amounted to a 51.3 percent increase over the average hardware sales from 1977-1980, Oxman's base year calculation for Ford tractors was also projected as a 51.3 percent increase. To that base year projection, Oxman added tapering yearly increases ranging from 40 percent to not less than 10 percent: the tapering percentage increases were to account for market saturation; the percentage figures were arrived at by extrapolating percentages solely from de la Rigaudiere and Smith's estimates of the number of Ford tractors they believed they could sell in each year spanning 1982 through 1991.
 
 
 94
 As an initial matter, the defendants challenge to this ten year span of time merits discussion. Because it relates to the fraudulent misrepresentation by Ford Motor, we retrace some of that evidence here. Throughout the course of this litigation, the plaintiffs had taken the position that after the March 3, 1981, meeting with Crawford and Nickel, they believed they would be permitted to operate the Ford franchise in Kennett Square for an additional two to three years. This understanding was consistent with Ford Motor's Northeastern District Manager Eugene Fraher's statements at their meeting in Cohoes, New York, in June of 1980, that if they submitted an adequate business plan, he would consider their application for the Kennett Square location during an interim two to three year period before they relocated to the Oxford/Cochranville area.[9] In fact, Smith testified during the damages portion of the trial that he understood Fraher's promise to be limited to two to three years.
 
 
 95
 De la Rigaudiere also testified during his deposition and at one point in the damages portion of the trial that he interpreted Nickel's omission of a Cochranville location as approval by Ford Motor of the business plan they had sent to Fraher pursuant to the June 1980 meeting. De la Rigaudiere altered his testimony in the midst of the damages trial, responding as follows to the district court's question, "Are you changing that answer now?": "Yes. And the reason is because I can remember how elated we were at the end of that meeting with Mr. Nickel, and I remember my aunt [Isabelle Tunis] and David [Smith] being very elated about it, because there was nothing mentioned about Cochranville or Oxford." Despite de la Rigaudiere's recall of Smith's "elation," there is no evidence that it was related to an indefinite franchise at the Kennett Square location other than de la Rigaudiere's sudden change of testimony. Even granting to the jury the benefit of all credibility determinations, the record does not sufficiently substantiate a ten year period of time. Thus, upon remand, the compensatory damages evidence must be limited to that two to three year period of time dating from the 1981 franchise termination.
 
 B.
 
 96
 Next, we examine the issue of whether the proper measure of damages is net profits rather than gross profits. Our starting point is the case of Delahanty v. First Pennsylvania Bank, N.A., 318 Pa.Super. 90, 464 A.2d 1243 (1983). In addressing the compensatory damages issue, the court in Delahanty observed that "[u]nder Pennsylvania law, in an action based on fraud, the measure of damages is 'actual loss,' ... and not the benefit, or value, of that bargain." Id. at 117, 464 A.2d at 1257 (citing Kaufman v. Mellon Nat'l Bank and Trust Co., 366 F.2d 326, 331 (3d Cir.1966), which provided the Pennsylvania rule that in a fraud action, the plaintiff is entitled to recover his actual loss); see also Baldassari v. Baldassari, 278 Pa.Super. 312, 317, 420 A.2d 556, 559 (1980) (citing Kaufman for a statement of the rule requiring proof of lost net profits).
 
 
 97
 It does not follow, however, that the plaintiffs should have been permitted to introduce evidence pertaining only to lost gross profits. Rather, as we determined in Deaktor v. Fox Grocery Co., 475 F.2d 1112, 1116 (3d Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973), the appropriate measure of damages with respect to future lost profits is net profits, not gross. "Net profits" are defined as "gross revenue less fixed costs, and less variable costs pegged to the number of units sold." Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1351 (3d Cir.1975). In Deaktor we stated that the "[p]laintiffs' failure to produce evidence concerning the factors essential to establish net profit as opposed to gross profit, in effect, meant that the jury would have had to speculate as to the amount of damages."
 
 
 98
 Tunis Brothers asserted that gross profits constituted a proper measure of damages because there would not have been any discernible increased cost in overhead expenses associated with the projected lost tractor sales. The only cost increases--which Oxman described as "negligible"--would have been truck operation costs and sales commissions to Fert-L Soil salesmen[10], these latter estimated at $8,800 per year or $88,000 over the ten year period. Any other additional overhead costs, according to Oxman, would have been negated by the rate of inflation. Tunis Brothers thus contended that Ford tractor sales did not appreciably increase its fixed overhead expenses; utilities and salaries would have remained the same regardless of additional tractor sales. Oxman differentiated between net profits reflected in Tunis Brothers' corporate tax returns and the true profit picture of the business. For example, during Richard and Isabelle Tunises' ownership, the corporate tax returns for Tunis Brothers showed very small net profits.[11] According to the plaintiffs, this small net profit was merely a tax-driven manipulation of the figures because as individuals the Tunises were taxed at lower rates so that they, as the sole shareholders, elected to distribute nearly all of Tunis Brothers' profits in the form of their salaries. Oxman opined that where a small corporation is in character similar to a sole proprietorship, as was Tunis Brothers under the Tunises, or a partnership, as under de la Rigaudiere and Smith, he calculated the business' real profit before payment of the owners' salaries. In other words, because the amount of those salaries were not fixed, but depended upon net profit, Oxman did not categorize the owners' salaries as regular business expenses.
 
 
 99
 Tunis Brothers therefore presented evidence only of gross profits. Yet upon cross-examination, Oxman admitted that the gross profits on any increased tractor sales would be reduced by "the whole litany of expenses that a company has other than direct sales." Additional sales would also have required additional costs associated with labor for assembly and warranties. Oxman further conceded that those additional expenses would include such things as salaries, utilities, taxes, rent, and insurance. For example, Oxman testified that he assumed that Tunis Brothers' floor plan insurance provided umbrella coverage and that any additional tractor stock on the premises would not have raised the insurance premiums; he admitted, however, that he had neither read, nor inquired into, the terms of that policy.
 
 
 100
 This case clearly demonstrates the point that we made in Deaktor; absent quantification of numerous costs accruing with additional sales, the jury was left to speculate as to the amount of net profits recoverable in compensatory damages. Since the appropriate measure of damages is net profit, the plaintiffs must produce evidence of costs related to additional sales upon retrial.
 
 
 101
 In Delahanty, the court further limited proof of lost profits: "[a] review of the cases in Pennsylvania involving lost profits shows that the courts are reluctant to award them, except when the business concerned is established and not 'new and untried.' ... There are no cases in Pennsylvania which deal with the award of damages for anticipated lost profits in a fraud case." Id. 318 Pa.Super. at 120, 464 A.2d at 1258.
 
 
 102
 Certainly in a technical sense Tunis Brothers was a "new and untried" business concern when de la Rigaudiere and Smith assumed the ownership and control of the company. Some degree of uncertainty with respect to future profitability will almost always be associated with a transfer of ownership. However, in this case the business being transferred had already been in existence for almost fifty years. In this way, Tunis Brothers is distinguishable from other "new and untried" businesses. In Delahanty, the Superior Court adopted two propositions which had arisen from a line of cases involving new and untried businesses in the estimation of alleged lost profits: (1) a business should be taken out of the "new and untried" category if it can show a significant interest in its product or service before the contract breach occurred, and (2) it is better that a jury hear evidence of future lost profits and decide its weight rather than allow the court to exclude the evidence entirely. Delahanty, 318 Pa.Super. at 123-24, 464 A.2d at 1260.
 
 
 103
 Tunis Brothers meets the "significant interest in their product" requirement; after fifty years of business, Tunis Brothers had an established clientele consisting of mushroom farmers. Given de la Rigaudiere's prior involvement in the business and Smith's business contacts with mushroom growers, it would be reasonable for a jury to conclude that this clientele would continue to purchase services and products from Tunis Brothers after the change of ownership. In addition, it is important to remember that the Pennsylvania Superior Court has concluded that "courts should liberally allow evidence of alleged lost profits to be submitted to the jury and let them decide if in light of the history of the business whether the amount of such profits could be estimated with reasonable certainty so as to allow recovery." Delahanty, 318 Pa.Super. at 123-24, 464 A.2d at 1260.
 
 
 104
 We are constrained to note that, when demonstrating net profits upon retrial, the plaintiffs must present a factually consistent theory unless much more appears than was developed at the first trial; they may not claim that, on the one hand, Tunis Brothers was an established business in order to overcome the presumption that lost profit damages for a new business are too speculative, see Delahanty, 318 Pa.Super. at 117-18, 464 A.2d at 1257-61, and on the other hand, rely solely upon the attribute of new management to forecast damages vastly exceeding the profitability of the old management. The plaintiffs rely upon Richard Tunis' cultivation of the mushroom growers' business to substantiate their claim that their future profits in this fifty year old business would not be speculative; yet they also disclaim Tunis Brothers' net profits and the inverse relationship between Ford and hardware sales achieved during Richard Tunis' management. In so doing, they anticipated that their youth and energy would have vastly increased Tunis Brothers' profitability and that Richard Tunis' performance, allegedly curtailed by his age and ill health during the late 1970's, did not accurately forecast their future performance. This proposition would have to be thoroughly documented to survive.
 
 
 105
 We have less difficulty accepting the plaintiffs' choice of 1981 as the base year for its compensatory damages calculation. The plaintiffs contend that they chose this year because it was the only year in which they operated the Ford franchise, albeit for only a three-month frame of time. If net profits for the entire year of 1981 are properly extrapolated from the figures underlying those three months during which the plaintiffs operated the Ford franchise, then this would constitute an appropriate base year. This base year would factor in Smith's and de la Rigaudiere's more aggressive sales strategies, the possible benefit to Tunis Brothers from a doubling of active management, and physical improvements to the store. A jury could properly ascertain whether Tunis Brothers would have benefitted from Smith's and de la Rigaudiere's management, extrapolated from the January through March of 1981 time period, in comparison to that of Richard Tunis' management during the 1977 through 1980 period. Certainly Smith and de la Rigaudiere had significant background in both the Tunis Brothers' business and the mushroom growers industry. Although Ford Motor now contends that they were "inexperienced," during the franchise negotiations, Eugene Fraher and Ken Harris were suitably impressed with the plaintiffs' experience and marketing strategies.
 
 C.
 
 106
 Nevertheless, the plaintiffs' extrapolation of projected Ford tractor sales for the entire year of 1981 from the increased percentage of hardware sales in 1981 is not supportable. The evidence indicates that under Tunis, hardware and tractor sales growth enjoyed an inverse relationship. Upon remand, the base year projection should be based upon Ford tractor, not hardware, sales; and if the selected base year is 1981, to account for Smith and de la Rigaudiere's sales performance, then the projections must reflect the seasonal nature of tractor sales as well as the plaintiffs' marketing strategy and actual tractor sales during the peak season/three month period they had the franchise in 1981.
 
 
 107
 We note that Ford challenges the percentage growth rate suggested by Morton Oxman as derived from scant evidence and mere speculation. Oxman predicted annual growth rates of between 40 percent and not less than ten percent for the ten year period from 1981 through 1991, gradually decreasing that percentage to account for market saturation. Oxman admitted that this percentage growth rate was premised solely upon the youth and vitality of Smith and de la Rigaudiere and calculated solely upon their expectations of how many tractors they could sell in a given year. Ford contends that the plaintiffs' failure with the Allis-Chalmers franchise as well as the mushroom industry depression demonstrate that Oxman's projected growth rates were wildly exaggerated.
 
 
 108
 Oxman was unable to correlate his percentage growth rate figures with any discernable data. He arrived at these figures by consulting with Smith and de la Rigaudiere concerning their sales goals and objectives. None of those underlying assumptions were substantiated at trial. Moreover, these objectives, although founded in good faith, cannot alone substantiate the growth rate percentages. This is true especially in light of the plaintiffs' admitted failure with their Allis-Chalmers franchise between 1982 and 1985.[12]
 
 
 109
 In our recent decision in Advent Systems, Ltd. v. Unisys Corp., 925 F.2d 670 (3d Cir.1991), we addressed an instance where a party seeking prospective lost profits in the context of a new and untried business relies purely upon industry projections rather than taking into account actual market results during the particular relevant time frame. In Advent, an expert relied heavily on industry projections prepared in 1986 and 1987. These projections predicted large increases in the sales of document systems. By the time of trial in 1989, however, actual results in the market place did not meet with the sanguine predictions in the market reports. Nevertheless, the expert relied on the projections rather than updating them based on actual results in the market. We concluded that "[w]e too have serious reservations about the validity of expert testimony based on prior predictions of sales for a given period when actual performance data for that same time span are available." Id. at 682.
 
 
 110
 Advent is instructive because its facts are remarkably similar to the case before us now. Oxman's projections of an increase in the growth rate of tractor sales by 40 percent in 1982 and an annual cumulative growth rate never less than 10 percent for the following nine years, are inconsistent with the state of the market during part of that time. The mushroom industry suffered a depression in the early 1980's and industry-wide sales of tractors in Chester County from 1983 to 1986 were flat, and in fact, did not reach the levels obtained in 1979. Tractor sales never reached the growth level of 40 percent estimated by the plaintiffs' expert. Although the plaintiffs claim that, like Wenner Ford's tractor sales during the 1980s, theirs would also have risen despite this depression, another tractor dealer Dudkewitz, the plaintiffs' own witness, testified that his tractor sales declined during that depression. Dudkewitz's sales may be more comparable to Tunis Brothers' sales than Wenner Ford's because both Dudkewitz and Tunis Brothers sold to mushroom growers affected by the depressed mushroom industry, while Wenner Ford's industrial customer base may have been less affected by mushroom industry woes. These factual judgments are properly ones for the jury; we caution, however, that a growth percentage rate determined only by the plaintiffs' speculation about the number of tractors that they could sell within a given year requires the jury to speculate and thus cannot support a compensatory damage award.
 
 
 111
 Last, the plaintiffs challenge the district court's exclusion of their "minimum additional damages" figures. The plaintiffs attempted to produce evidence that they sustained additional damages beyond the ten-year time frame in association with the franchise termination. The district court properly excluded this claim of damages as without merit and we will affirm on that point in light of our conclusion limiting damages to a time period not exceeding two to three years.
 
 
 112
 Based upon Delahanty, Deaktor, and Advent, we conclude that the plaintiffs may submit to the jury evidence of alleged lost net profits only. The evidence of lost gross profits was too speculative to support an award of damages. Therefore, we will grant a new trial on compensatory damages in which the plaintiffs shall be entitled to produce evidence pertaining to net lost profits and which shall account for actual results in the market place rather than those based purely on outdated and speculative predictions. Furthermore, testimony with respect to the anticipated lost net profits should be derived both from factors, independent of management, characteristic of Tunis Brothers such as overhead costs and seasonal sales, as well as from demonstrable attributes and the marketing strategy of the new management. A limitation of such evidence would balance the dictates of Delahanty that the evidence introduced have a sufficient basis (in this case actual past sales production) for estimating with reasonable certainty the amount of the lost anticipated profits, with reasonable expectations of increased profitability under new management.
 
 V.
 
 113
 We turn at last to the jury's award of punitive damages. Ford Motor and Ford Credit assert that the punitive damages award of $4 million is unwarranted and seek relief in the form of a new trial or remittitur. Because we will reverse the judgment against Ford Credit on both the fraud and antitrust counts, we will set aside that $1.2 million portion of the punitive damages award attributed to Ford Credit. See, e.g., Emerick v. United States Suzuki Motor Corp., 750 F.2d 19, 22 (3d Cir.1984) (liability for compensatory damages is a prerequisite to punitive damages). Having determined that the fraud claim against Ford Motor is supported by "that minimum quantum of evidence" required to uphold a jury's verdict, Link, 788 F.2d at 921, we turn to consider whether the record also supports an award of punitive damages.[13]
 
 
 114
 We note that although "the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact finder," Delahanty, 318 Pa.Super. at 129, 464 A.2d at 1263 (citations omitted), the legal and factual prerequisite for an award of punitive damages is outrageous conduct. See Feld v. Merriam, 506 Pa. 383, 395, 485 A.2d 742, 748 (1984) (adopting the Restatement (Second) of Torts, § 908(2), concerning the imposition of damages); Martin v. Johns-Manville Corp., 508 Pa. 154, 169, 494 A.2d 1088, 1096 (1985) (plurality decision). The Restatement provides, in pertinent part:
 
 
 115
 Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.
 
 
 116
 Restatement (Second) of Torts, § 908(2). The first factor required for punitive damages--outrageous conduct--rests upon the purpose of punitive damages to deter and punish such conduct. Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 100, 555 A.2d 800, 802 (1989); Restatement (Second) of Torts, § 908 comment b. As explained by the Supreme Court of Pennsylvania in Kirkbride, three factors are to be considered in awarding punitive damages:
 
 
 117
 1) the character of the act; 2) the nature and extent of the harm, and 3) the wealth of the defendant.
 
 
 118
 Kirkbride, 521 Pa. at 102, 555 A.2d at 803. Our resolution of the propriety of the award of punitive damages in this case rests upon the first factor.
 
 
 119
 The plaintiffs assert that the jury's verdict of liability on the fraud count sufficiently establishes outrageous conduct for punitive damages. We are mindful of the language of Delahanty which suggests that "... it is difficult to picture a fact pattern which would support a finding of intentional fraud without providing proof of 'outrageous conduct' to support an award of punitive damages." 318 Pa.Super. at 130; 464 A.2d at 1263. Nevertheless, this language of Delahanty constitutes dictum because the court in Delahanty found that the fraud committed was outrageous "and involved a bad motive." Id. at 132-33, 464 A.2d at 1264-65. There the defendant bank had accumulated confidential information concerning its customer's business and misappropriated that information to compete with and to drive that customer out of business. Id. at 132, 464 A.2d at 1264.
 
 
 120
 Moreover, that dictum has not been adhered to by that court. See Smith v. Renaut, 387 Pa.Super. 299, 564 A.2d 188 (1989), where the court explicitly held that the evidence did not support "aggravated circumstances" necessary to add punitive damages to an award of compensatory damages in a fraud action. Id. at 309, 564 A.2d at 193.
 
 
 121
 [Where] fraud ... is the basis for the recovery of compensatory damages, ... the same fraud is not alone a sufficient basis upon which to premise an award of punitive damages.... If the rule were otherwise, punitive damages could be awarded in all fraud cases. That is not the law. The rule, rather, is that for punitive damages to be awarded there must be acts of malice, vindictiveness and a wholly wanton disregard of the rights of others.
 
 
 122
 Id. (citations omitted). We are persuaded that this latter view, taken in conjunction with the Pennsylvania Supreme Court's adoption of the Restatement, requires a quantum of outrageous conduct in addition to that undergirding the fraud liability and compensatory damages.
 
 
 123
 The evidence in this case clearly did not meet that level of outrageous or malicious conduct required to sustain an award of punitive damages. Ken Harris and William Heck of Ford Motor favored the plaintiffs' application and they lobbied their superiors to approve the plaintiffs' franchise application. The ultimate decision, made by Ed Hasel, followed a full discussion of the merits of the application. Moreover, the plaintiffs were permitted to submit a second franchise application, and even as late as October of 1981 were encouraged to provide Ford Motor with information pertaining to a Cochranville location. Long before the sales agreement precipitating the plaintiffs' application, Ford Motor had determined that Kennett Square would be an attrition point for business reasons relating to a geographic shift in the market; the plaintiffs did not prove that their franchise application was disapproved as a result of malice on the part of Ford Motor.
 
 
 124
 Nor did the fraudulent misrepresentation inducing Tunis' resignation constitute the requisite outrageous conduct for punitive damages. The plaintiffs do not contest that under the terms of the franchise agreement, Ford Motor retained the unconditional right to terminate the Tunis Brothers' franchise upon 60 days notice. Although Ford Motor chose not to exercise that right, but, according to the jury verdict, chose to fraudulently induce Tunis' resignation, an election to exercise its termination upon 60 days notice would not have constituted outrageous conduct. An election not to grant a franchise application similarly does not justify punitive sanctions.
 
 
 125
 Because we have not found evidence in this record to support an award of punitive damages, we decline to resolve the thorny issue presented by the apparent conflict between the United States Supreme Court's decision in Pacific Mutual Life Ins. Co. v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), which suggested that punitive damages that are disproportionate to compensatory damages may violate due process, and the Pennsylvania Supreme Court's decision in Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 555 A.2d 800 (1989), which held that because punitive damages are intended for punishment and deterrence, they need not be commensurate with compensatory damages. Here, where a less far reaching conclusion requires that we vacate the award of punitive damages, we will refrain from considering the constitutionality of the Pennsylvania scheme. Lacking the basis of outrageous conduct, an award of punitive damages cannot stand. We will vacate the award of $2.8 million in punitive damages against Ford Motor.
 
 VI.
 
 126
 We shall not address the issues raised by the plaintiffs on their cross-appeal as the plaintiffs waived them by failing to argue them in their briefs. See Jackson v. University of Pittsburgh, 826 F.2d 230, 237 (3d Cir.1987); FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1025-26 (7th Cir.1988). Instead of providing argument with respect to their issues, the plaintiffs merely referred to their pre- and post-trial briefs. We therefore decline to address those issues. In addition, to the extent that their cross-appeal concerns issues related to exclusion of the evidence of compensatory damages, since we are remanding for a new trial on that issue, we need not address those issues in any case.
 
 VII.
 
 127
 In light of the foregoing, we will reverse the denial of the motion for judgment n.o.v. as to all of the defendants on the antitrust claim, and only as to Ford Credit only on the fraud claim. We will affirm the order of the district court denying Ford Motor's motion for judgment n.o.v. on the fraud claim. We will therefore remand this action for a new trial on compensatory damages against Ford Motor on the fraud count. We will vacate the award of punitive damages in its entirety.
 
 
 
 [1]
 Prior to trial, the district court dismissed the individual defendants, who were employees of either Ford Motor Company or Ford Motor Credit Company and the jury returned a verdict in favor of the remaining individual defendant, John S. Wenner. Moreover, the district court granted judgment n.o.v. in favor of the defendants on their motions to dismiss the individual plaintiffs, Richard N. de la Rigaudiere and David C. Smith
 
 
 [2]
 Count I alleged a per se violation of section 1 of the Sherman Act based on a horizontal conspiracy to allocate markets. Count II alleged that the franchise agreement between Tunis Brothers and Ford Motor was a contract in restraint of trade in violation of section 1 of the Sherman Act. Count III alleged the same conduct as count I denominated as "dirty business tricks." Count VI alleged that Ford Motor breached the franchise contract between the parties
 
 
 [3]
 Although du Pont and Mogul involved section 2 of the Sherman Act, we believe that the analyses employed in those cases in defining a relative product market are instructive in this section 1 case
 We are cognizant that in Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 27 n. 11 (3d Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), we intimated that "the inquiries into the scope of competition under § 1 and § 2 are not precisely the same." See also Martin B. Glauser Dodge Co., 570 F.2d at 81-82 n. 17 (declining to address whether the relevant product market, as defined in cases involving section 2 claims, would also apply to section 1 cases). On this record, however, the plaintiffs do not present a sufficiently close factual issue to demarcate a distinction between product market definitions in section 1 and section 2 cases where there is simply no evidence of a Ford only tractor market. We are not confronted with a gray zone where "rival products might provide sufficient competition to foreclose a finding of monopolization, yet the degree of insularity of the initial product might allow a finding of illegal restraint of trade in regard to restrictions imposed within that initial market." Columbia Metal, 579 F.2d at 27 n. 11.
 
 
 [4]
 However, inconsistent with Tunis I, in which we indicated that the plaintiffs had not pursued their claim that Ford Motor and its wholly-owned subsidiary Ford Credit had conspired in violation of the antitrust law, 763 F.2d at 1495 & n. 20, the plaintiffs did pursue this theory at trial. The plaintiffs even stipulated that Ford Credit is a wholly-owned subsidiary of Ford Motor. We need not here apply Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which held that a parent and its wholly-owned subsidiary were "incapable of conspiring with each other for the purposes of § 1 of the Sherman Act," to determine whether either Ford Credit or Wenner Ford could have been capable of conspiring with Ford Motor. Because the relationship between Wenner Ford and Ford Motor differs, for Sherman Act conspiracy purposes, from the Copperweld or Ford Motor/Ford Credit relationship, we decline to consider where, as here, the plaintiffs were unable to establish antitrust liability
 
 
 [5]
 In Matsushita, the Court reversed a grant of summary judgment for the plaintiffs, reasoning that the evidence did not rule out the possibility that the allegedly conspiratorial conduct of the defendants was consistent with legitimate business interests. 475 U.S. at 597-98, 106 S.Ct. at 1361-62. The Court thus held that the plaintiffs had failed to prove the lack of a genuine issue of material fact to prevail on the motion for summary judgment
 Relying upon Matsushita, the Ford defendants requested that the district court instruct the jury that in order for Tunis Brothers to prevail, the jury must find that they had a motive to conspire in violation of the antitrust laws and that they acted inconsistently with their economic interests. The district court gave to the jury a standard antitrust conspiracy charge and denied the Ford defendants' motion "[t]o the extent [the standard instructions] fail to incorporate the defendants' requested instruction on motive." District Court Memorandum Opinion Typescript at 14 n. 3.
 
 
 [6]
 Ford differentiates between a "company store," entirely owned and operated by Ford, and a dealer development franchise such as Wenner's into which Ford infuses capital to struggling dealerships in exchange for all the voting stock and a large majority of the equity ownership of the company. The avowed purpose of the dealer development program is to assist struggling dealerships temporarily and then to promote gradual repurchase of the equity by the franchise holder. For a general description of these arrangements, and certain antitrust consequences, see Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72 (3d Cir.1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978)
 
 
 [7]
 All three Ford defendants contend that the plaintiffs altered their compensatory damage claim midway through the damages portion of the trial when confronted with inaccuracies in the underlying data. Further, they claim that no documentation was provided to them for the revised damage claim. In addition, the Ford defendants challenge the notice, as late as mid-December of 1989, that Dr. Samuel J. Kursh would appear as an expert witness for the plaintiffs. Although successful in precluding Kursh's testimony at the damages trial because of this late notice and the cumulative nature of Kursh's testimony, Tunis Brothers has appealed that ruling. Should Tunis Brothers be able to satisfy the district court on remand that Kursh's testimony is not cumulative, and we express no opinion as to whether this will be possible, we are confident that the plaintiffs will provide adequate notice that Kursh will be testifying
 
 
 [8]
 Tunis Brothers did continue to buy Ford parts from other franchises during 1981; however, they made less profit on these items and it is not contended that these ought to be included in the 1981 projection as franchise related profits
 
 
 [9]
 The plaintiffs planned to open a Ford franchise in Cochranville but also planned to maintain the Tunis Brothers' Kennett Square location for service and hardware sales. They failed, however, to provide evidence of damages for the loss of a Cochranville franchise. In this connection, a November 16, 1981, letter from Fraher to Smith, which indicated that "[Ford has] no problem with you relocating to Cochranville.... When you locate a building please let us know so that we can look at it," combined with the plaintiffs' own testimony, suggests that they declined further to pursue a Ford franchise. Thus their expert, Oxman, lacked the requisite foundation to testify that even if the Kennett Square franchise was conditional upon moving to Cochranville in two to three years, the termination of the franchise resulted in losses to the Kennett Square location regardless of costs associated with a Cochranville location
 
 
 [10]
 De la Rigaudiere and Smith had planned to increase Tunis Brothers' Ford tractor sales in three different ways. First, de la Rigaudiere planned to pursue 50 percent of the Ford tractor sales at the Kennett Square location. Second, David Smith would have made 25 percent of their Ford tractor sales while visiting farms in connection with Fert-L Soil sales. For these sales, Smith would not receive a commission, nor would his salary from Tunis Brothers have been increased. The last 25 percent of Tunis Brothers Ford tractor sales would have been pursued by other Fert-L Soil salesman, who would have received a four percent commission on their Ford tractor sales, estimated to total approximately $8,800 per year. Other than these commissions, no additional costs were attributed to Tunis Brothers for the Fert-L Soil salesmen because Fert-L Soil, Smith's family owned and operated business, would have borne those costs
 
 
 [11]
 For 1975, Tunis Brothers's net profit was reflected in its corporate tax return as $5,346.57, for 1976 as $383.10, for 1977 as $16,358.93, for 1978 as $347.72, for 1979 as $1,393.00, and for 1980 as $1,632.04
 
 
 [12]
 Although the plaintiffs attribute that failure to the unsuitability of the Allis-Chalmers tractor to mushroom growers, whether their failure with that line is justified by the difference between Allis-Chalmers and Ford tractors is a factual issue particularly suited to a jury's resolution
 
 
 [13]
 We are also quite troubled by the grossly improper remarks of the plaintiffs' counsel during his closing argument at the close of the damages case. Frustrated by the district court's exclusion of much of the plaintiffs' evidence of damages, concerning non-tractor Ford sales, service or hardware sales, and the closing remarks of Ford Motor's counsel, the plaintiffs' counsel argued to the jury:
 I ask you, I beg you, give us as much in damages as the Judge will permit you to give us. And then--and then it is going to be within your discretion, in the fraud case, to give us as large an amount of punitive damages--and I can't tell you what to add and I can't tell you what to multiply, but I ask you to give us as much punitive damages to make up for our inability to receive compensation for all of the nontractor Ford sales, half of the total sales of this company projected to 10 years, to make up for what we can't get. (Emphasis added).
 Although requested by Ford Motor, the district court did not give a curative instruction on this point. Given the disproportionate size of the punitive damage award as compared to the compensatory damage award, we are unable to conclude decisively that the jury dispassionately awarded punitive damages to deter "outrageous conduct" rather than making up for compensatory damages that were excluded for lack of evidence.